**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:16-cv-01804-PAB-NRN

FLAVIE BONDEH BAGOUE; and those similarly situated

      Plaintiff,

v.

DEVELOPMENTAL PATHWAYS, INC., and
CONTINUUM OF COLORADO, INC.

      Defendants.

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

      Developmental Pathways, Inc. ("Developmental Pathways") and Continuum of Colorado, Inc. ("Continuum") (collectively, "Defendants") move for summary judgment on all of Plaintiff's claims pursuant to Federal Rule of Civil Procedure 56, and in support thereof state as follows:

### SUMMARY OF DEFENDANTS' POSITION

      Plaintiff's Amended Complaint asserts three claims against Defendants: Count One alleges violations of the Colorado Minimum Wage Order (the "Wage Order"); Count Two alleges violations of the Fair Labor Standards Act ("FLSA"); and Count Three alleges violation of quasi-contract under Colorado law. The Court should grant summary judgment as to each of these claims, respectively because: the Wage Order does not apply to Defendants; Plaintiff was compensated as required by the FLSA; and because Plaintiff's quasi-contract claims are pre-empted by the FLSA.

      Count One. The Wage Order covers only four industries, and Defendants are not within the four industries covered. The Colorado Department of Labor and Employment has expressly clarified this point, explaining that Developmental Pathways and Continuum are not covered by the Wage Order, respectively, because of their business as a Community Centered Board, and as

a service agency. Because the Wage Order is not applicable to Defendants, this Court should grant Defendants' motion for summary judgement as to Count One.

Count Two. The second cause of action alleges compensation claims under the FLSA for sleep-time and for preliminary and post-liminary time. There is no genuine issue of material fact that Plaintiff was compensated for all time worked as required by the FLSA. Federal regulations provide that sleep-time may be excluded from compensable time in the circumstances present here, and Plaintiff was compensated for all reported sleep-time interruptions. Likewise, federal law provides that *de minimis* pre- and post-liminary time is not compensable in the circumstances present here; but nonetheless, Plaintiff was compensated for the pre- and post-liminary time complained of under the quarter-hour rounding procedure in place here. Because there is no genuine issue of material fact that Plaintiff was compensated for all time worked as required by the FLSA, this Court should grant Defendants motion for summary judgment as to Count Two.

Count Three. The third cause of action alleges a state law quasi-contract claim based on the same facts as Plaintiff's FLSA claims. Plaintiff's claims under Count Three are pre-empted by the FLSA because the facts on which both claims are based are identical. Because Plaintiff's quasi-contract claims are pre-empted by the FLSA, this Court should grant Defendants' motion for summary judgment as to Count Three.

For these reasons, and as set forth more fully below, this Honorable Court should grant Defendants' motion for summary judgment and dismiss with prejudice all of Plaintiff's claims.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Your Honor's Civil Practice Standards III.F.3.b., below is a recitation of the facts in this case that are undisputed by Defendants for purposes of this Motion only (the "SOF").

Defendants do not admit that the facts as stated below are true, nor do they waive their rights to dispute these facts at trial should Defendants' motion be unsuccessful in whole or in part.

1.     Developmental Pathways is the not-for-profit state-appointed Community Centered Board for Arapahoe and Douglas Counties and the City of Aurora. *See* Exhibit "A"[1] at 9:22-25; *See* Exhibit "B"[2] at ¶ 5; *see also* C.R.S. § 25.5-10-209.

2.     Developmental Pathways serves individuals with developmental disabilities and their families. *See* Exhibit "B" at ¶ 6; *see also* Developmental Pathways' Website available at *https://www.dpcolo.org/about-us* (last visited Nov. 19, 2018).

3.     As a Community Centered Board, Developmental Pathways is a quasi-public entity, which receives Medicaid waiver funds and county mill levy funds for defined public purposes, and is subject to regulation by state statute. *See* Exhibit "B" at ¶ 7.

4.     Continuum is a not-for-profit state-designated Program Approved Service Agency located in Colorado that is planned, designed, organized, operated, and maintained to provide services to and for individuals with developmental disabilities. *See* Exhibit "A" at 10:3-6; Exhibit "C"[3] at ¶¶ 5-6; *see also http://www.hfemsd2.dphe.state.co.us/hfd2003/facfind.aspx* (last visited Nov. 19, 2018); C.R.S. § 25.5-10-202(34).

5.     Continuum provides services for persons with intellectual and developmental disabilities and has received approval by the Colorado Department of Health Care Policy and Financing pursuant to C.C.R. § 2505-10-8.603. *See* Exhibit "C" at ¶ 5.

6.     Continuum exists to provide services to people with a wide range of developmental disabilities and operates group homes for the developmentally disabled throughout Colorado. It

---

[1] A true and accurate copy of Continuum's deposition transcript is annexed hereto as Exhibit "A".
[2] A true and accurate copy of the Declaration of Lloyd Sweet, Jr. is annexed hereto as Exhibit "B".
[3] A true and accurate copy of the Declaration of Cindy Dutton is annexed hereto as Exhibit "C".

strives to provide normal living and social environments to adults with moderate developmental disabilities who function with some supervision. *See* Exhibit "A" at 10:3-9; Exhibit "C" at ¶ 6.

7.      Developmental Pathways, as a Community Centered Board, provides case management services to persons with developmental disabilities, is authorized to determine eligibility of such persons within a specified geographical area, and serves as the single point of entry for persons to receive services and supports pursuant to C.R.S. § 25.5-10-211. *See* Exhibit "B" at ¶ 9; *see also* C.R.S. § 25.5-10-206.

8.      Continuum, as a service agency, provides services and supports such as family support, respite care, day services, and residential services to persons eligible pursuant to C.R.S. § 25.5-10-211. *See* Exhibit "C" at ¶ 7; *see also* C.R.S. § 25.5-10-206.

9.      Developmental Pathways and Continuum were a single legal entity until 2012, when Continuum was established as a separate and distinct legal entity from Developmental Pathways. *See* Exhibit "A" at 21:16-22:17.

10.      Plaintiff was originally employed by Developmental Pathways and then solely by Continuum commencing in 2012, for approximately twelve years total. *See* Exhibit "D"[4], at ¶ 5; Exhibit "E"[5] at 8:23.

11.      Plaintiff worked exclusively for Continuum as a Life Skills Specialist ("LSS") at one of its group homes, the Nevada House, a residence for adults with developmental disabilities from 2012, until she resigned from Continuum in June of 2016. *See* Exhibit "D", at ¶ 6; Exhibit "A" at 21:13-15, 24:5-21; Exhibit "E" at 50:13-19.

---

[4] A true and accurate copy of Defendants Answer to the Amended Complaint is annexed hereto as Exhibit "D".

[5] A true and accurate copy of Plaintiff's deposition transcript is annexed hereto as Exhibit "E".

12.     Group homes are designed to help individuals with developmental disabilities to live as independently as possible by creating a living environment that represents the least departure from typical patterns of living and that effectively meets their needs and preferences, *i.e.*, the "lease restrictive environment." *See* Exhibit "C" at ¶ 16; *see also* C.R.S. § 25.5-10-202(29).

13.     As an LSS, Plaintiff's principal job duties were to provide day-to-day care for the residents of the Nevada House, which consisted of tasks like: cooking meals, cleaning the house, taking residents to doctors' appointments and to church, grocery shopping, and other like needs. *See* Exhibit "A" at 73:5-10; Exhibit "E" at 40:19-41:7.

14.     During what is referred to as the "2.5 Day Shift," Plaintiff was scheduled to be at the Nevada House for a 56-hour period. During this period, Plaintiff was scheduled to work 40-hours while both she and the residents were awake. These 40 hours consisted of two 16-hour work shifts and one 8-hour work shift. *See* Exhibit "A" at 61:21-62:2.

15.     To support residents in the least restrictive environment of their choosing, stakeholders and agencies across the state have designed group homes like Nevada House to help residents to live as independently as possible, as well as the 2.5 Day Shift to foster a person-centered, home-like environment for the residents with minimal interruptions from transitioning staff. *See* Exhibit "C" at ¶ 17; *see also* C.R.S. § 25.5-10-202; C.R.S. § 25.5-10-207.5(1)(a)(I).

16.     As part of the 2.5 Day Shift, Plaintiff was provided with two 8-hour sleeping periods in a private bedroom at the Nevada House; this sleep-time was not compensated unless Plaintiff was awoken to provide supervision to residents, in which case Plaintiff was always compensated when she reported such calls to duty. *See* Exhibit "A" at 61:21–62:2; Exhibit "E" at 109:7-16, 139:18-22; Exhibit "C" at ¶¶ 20 & 23.

17.     When Plaintiff accepted the LSS position, she knew that her shifts would be 56 hours in length for which she would be paid for the 40 hours she worked and not for the two 8-hour periods of sleep-time during her 2.5 Day Shift. *See* Exhibit "E" at 45:7-11.

18.     Continuum utilized an electronic recordkeeping system to track the hours worked by non-exempt employees like Plaintiff. *See* Exhibit "F"[6] at p. 20, ¶ 801

19.     Continuum maintained a policy and practice requiring employees to record all time worked, including all calls to duty or instances where LSS were required to supervise a resident during an employee's sleep-time. *See* Exhibit "A" at 86:7-24; Exhibit "F" at p. 12, ¶ 304; Exhibit "C" at ¶ 19.

20.     To the extent an LSS was awoken during sleep hours requiring her to provide supervision to residents or to perform work, that time was to be recorded by the LSS, and the LSS would be paid for the sleep-time interruption. *See* Exhibit "A" at 86:11-87:25; Exhibit "C" at ¶ 20.

21.     An employee's failure to report any instances of work performed during their sleep-time is a violation of both Continuum's written policy, under which employees are required to record all work performed, and Continuum's prohibition of performing any work off the clock. *See* Exhibit "C" at ¶ 21; Exhibit "F" at p. 12, ¶ 402.

22.     Incidents like those described by Plaintiff, *i.e.*, where she alleges she was awoken by a resident tickling her feet, are considered by Continuum to be incidents requiring LSS to provide supervision of a resident and therefore, any such incidents should have been recorded. *See* Exhibit "C" at ¶ 22.

23.     Plaintiff's payroll records show that she was paid for every reported instance where she was awoken during sleep hours requiring her to provide supervision to residents or to perform

---

[6] A true and accurate copy of Continuum's Employee Handbook is annexed hereto as Exhibit "F".

work. *See id.* at ¶ 23; Exhibit "G".

24.     Plaintiff's time-keeping records show that she reported sleep interruptions on 17 occasions, and that she was compensated on all occasions so reported. *See* Exhibit "G".[7]

25.     Continuum could not know about any calls to duty or other work performed by Plaintiff during her sleep-time unless Plaintiff reported having worked. *See* Exhibit "C" at ¶ 24.

26.     Plaintiff did not permanently reside at Nevada House. *See* Exhibit "D" at ¶ 19.

27.     Plaintiff slept in a private bedroom with a private bathroom and shower at Nevada House. *See* Exhibit "E" at 129:17-20; 131:5-6.

28.     Plaintiff was provided with pillows and sheets for her own use in the private bedroom at Nevada House. *See id.* at 129:5-8.

29.     Plaintiff's bedroom at the Nevada House was heated. *See id.* at 129:21-22.

30.     Plaintiff had access to a kitchen at the Nevada House as well as to her own refrigerator where could store her own food. *See id.* at 130:1-5.

31.     Plaintiff was able to eat the same food which was available for the residents at the Nevada House. *See id.* at 130:24-25.

32.     The room where Plaintiff slept at the Nevada House also functioned as an office during the day and was used as a private bedroom by other LSS during their individual shifts. *See* Exhibit "D" at ¶ 69.

33.     Since August 2016, the practice at the Nevada House has been to keep the hallway lights on for the safety of the residents. *See id.* at ¶ 71; Exhibit "E" at 119:1-14.

---

[7] True and accurate copies of Plaintiff's time records demonstrating payment for work performed during sleep periods and pre- and post-shift are annexed hereto as Exhibit "G".

34.     Developmental Pathways does not generate 50% or more of its annual dollar volume of business from the sale of any service, commodity, article, good, real estate, wares, or merchandise to the consuming public. *See* Exhibit "B" at ¶ 11.

35.     Developmental Pathways generates its income from donations and public funds, which it uses to provide services to individuals with developmental disabilities. *See id*. at ¶ 8.

36.     Developmental Pathways does not advertise its services to the general public, but instead contracts with the State of Colorado to provide services to clients. *See id*. at ¶ 12; *see generally* C.R.S. § 25.5.10-209(2)(c)-(h).

37.     Developmental Pathways does not provide services to other commercial firms through the use of service employees, as it provides specialized services to individuals with developmental disabilities, not other commercial firms. *See* Exhibit "B" at ¶ 13.

38.     Defendants do not prepare or offer food or beverages for sale or consumption to the public. *See id*. at ¶ 14; Exhibit "C" at ¶ 12.

39.     Defendants may have food prepared and provided to their clients as part of the services they provide, but at no time have Defendants prepared and offered food or beverages for consumption to the public for sale and does not separately charge its clients for served food. *See* Exhibit "B" at ¶ 15; Exhibit "C" at ¶ 13.

40.     Developmental Pathways is not a hospital, home health care provider, a hospice center, a nursing home or a mental health center nor does Developmental Pathways provide medical, dental, surgical, or other similar health services to its clients. *See* Exhibit "B" at ¶ 16.

41.     Developmental Pathways instead provides case management, early intervention services, determinations as to eligible persons' needs, and community outreach services. *See id*. at ¶ 17; *see also* Exhibit "A" at 9:22-10:2; C.R.S. § 25.5-10-209(2)(c)-(h).

42.     Continuum does not generate 50% or more of its annual dollar volume of business from the sale of any service, commodity, article, good, real estate, wares, or merchandise to the consuming public. *See* Exhibit "C" at ¶ 9.

43.     Continuum generates its income from donations and public funds, which it uses to provide services to individuals with developmental disabilities. *See id*. at ¶ 8; *see also* C.R.S. § 25.5-10-206.

44.     Continuum does not advertise its services to the general public, but instead contracts with the state and local government agencies within the State of Colorado, and with Community Centered Boards and Case Management Agencies within the State of Colorado, to provide services to individuals with developmental disabilities. *See* Exhibit "C" at ¶ 10.

45.     Continuum does not provide services to other commercial firms through the use of service employees, rather it provides specialized services to individuals with developmental disabilities, not other commercial firms. *See id*. at ¶ 11.

46.     Continuum is not a hospital, home health care provider, a hospice center, a nursing home or a mental health center nor does Continuum provide medical, dental, surgical, or other similar health services to its clients. *See id*. at ¶ 14.

47.     Continuum is a statutorily-defined service agency that provides services to individuals with developmental disabilities such as residential services, transportation, day programs, employment services, and other services to support people with intellectual or developmental disabilities. *See id*. at ¶ 15; Exhibit "A" at 10:3-9.

48.     LSS, including Plaintiff, were not responsible for the supervision of Nevada House residents until the start of their shifts, and such responsibilities ceased at the end of their shifts. *See* Exhibit "C" at ¶ 18.

49.     Any instance where an LSS, including Plaintiff, arrived to Nevada House prior to the start of their 2.5 Day Shift, this time was theirs to engage in personal activities with no work activities required to be performed. *See id.*, at ¶ 25.

50.     Plaintiff claims that she had to stay five minutes past her shift on occasion to share information with the employee taking over at the Nevada Home. *See* Exhibit "E" at 136:12-15.

51.     The client logs for Nevada House residents confirm that there were typically no significant client events during these shifts. *See* Exhibit "C" at ¶ 26.

52.     Plaintiff's time records confirm that she was compensated for all pre- and post-2.5 Day Shift conversations that took more than just a few minutes. *See* Exhibit "G" (2014: May 2, June 6, July 4, July 10; 2015: February 13, May 29, July 3, August 26, September 4, September 6, September 18, and October 30 (30 minutes)).

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material facts" are facts that, "under the substantive law[,] . . . [are] essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).  A "material fact" is part of a "genuine dispute" only "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.*  Summary judgment exists "to determine whether trial is necessary." *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

## ARGUMENT

I.   **STATE LAW CLAIMS UNDER THE WAGE ORDER SHOULD BE DISMISSED BECAUSE THE WAGE ORDER DOES NOT APPLY TO DEFENDANTS**

In Count One of the Amended Complaint, Plaintiff asserts claims against Defendants pursuant to the Wage Order.  In order to establish her claims under the Wage Order, Plaintiff must first establish that Defendants are covered by the Wage Order.  Plaintiff cannot establish this requirement.  Indeed, neither Developmental Pathways nor Continuum meet the requirements of any type of organization covered by the Wage Order.  Further, the Colorado Department of Labor and Employment ("Colorado Dep't of L&E") has expressly clarified that Developmental Pathways and Continuum are not covered by the Wage Order because of their business as a Community Centered Board and as a service agency providing services to individuals with intellectual and developmental disabilities, respectively.

A.   **The Wage Order applies to only four specific industries.**

The Colorado Minimum Wages of Workers Act provides that the director of the Colorado Division of Labor shall determine the minimum wage, as well as the standards surrounding the minimum wage (*e.g.*, overtime), for Colorado workers. *See* § 8-6-106, C.R.S.  Pursuant to that authority, the director issued the Wage Order. *See* 7 CCR 1103-1.  The Wage Order requires, *inter alia*, that certain employers pay certain employees time and one-half of the employees' regular rate of pay for work performed in excess of 12 hours in a workday. *See* 7 CCR 1103-1:4.

The Wage Order specifically identifies which employers it covers.  The only covered employers are those engaged in the following four industries: (i) Retail and Service; (ii) Commercial Support Service; (iii) Food and Beverage; and (iv) Health and Medical. *See* 7 CCR 1103-1:1. The Wage Order provides the following definitions for these industries:

(A) **Retail and Service:** any business or enterprise that sells or offers for sale, any service, commodity, article, good, real estate, wares, or merchandise to the consuming public, and that generates 50% or more of its annual dollar volume of business from such sales....

(B) **Commercial Support Service:** any business or enterprise engaged directly or indirectly in providing services to other commercial firms through the use of service employees who perform duties such as: clerical, keypunching, janitorial, laundry or dry cleaning, security, building or plant maintenance, parking attendants, equipment operations, landscaping and grounds maintenance....

(C) **Food and Beverage:** any business or enterprise that prepares and offers for sale, food or beverages for consumption either on or off the premises....

(D) **Health and Medical:** any business or enterprise engaged in providing medical, dental, surgical or other health services including but not limited to medical and dental offices, hospitals, home health care, hospice care, nursing homes, and mental health centers, and includes any employee who is engaged in the performance of work connected with or incidental to such business or enterprise, including office personnel.

7 CCR 1103-1:2.

The Wage Order does <u>not</u> apply to organizations outside of those specifically listed therein. For example, in a recent case, this Court dismissed claims under the Wage Order because the defendant there, the Boys & Girls Club, was not included in one of the four industries listed therein, because its operations were based on government funding rather than from sales from any product or service. *See Simmons v. Boys & Girls Club of the Pikes Peak Region*, 2017 WL 4337931 (D. Colo. Sept. 29, 2017).

**B.      Defendants are not subject to the Wage Order because neither is within the four industries covered by the Wage Order.**

     **i.      *Developmental Pathways is not within an industry covered by the Wage Order.***

Developmental Pathways is not subject to the Wage Order because Developmental Pathways is not an employer within any of the four industries covered by the Wage Order. Additionally, as set forth in Section C., *infra*, Developmental Pathways in not subject to the Wage

Order because the Colorado Dep't of L&E has clarified that Community Centered Boards are not covered by the Wage Order, and Developmental Pathways is a Community Centered Board.

Developmental Pathways does not meet any covered industry definition in the Wage Order. *See* 7-CCR 1103-1:1. Initially, Developmental Pathways is not in the retail and service industry because it does not "generate 50% or more of its annual dollar volume of business" from the sale of "any service, commodity, article, good, real estate, wares, or merchandise to the consuming public." 7 CCR 1103-1:2(A); *see* SOF ¶ 34. Rather, Developmental Pathways generates its income from donations and public funds, which it uses to provide services to individuals with developmental disabilities. *See* SOF ¶ 35. Further, Developmental Pathways does not advertise its services to the general public, but instead contracts with the State of Colorado to provide services to clients. *See id.* at ¶ 36; *Smith v. Mountain Valley Developmental Services, Inc.*, Case No.: 2018-cv-30026 (Colo. Dist. Ct. Apr. 12, 2018) (explaining that a Community Centered Board is not a retail and service organization, as it does not advertise services to the public).[8]

Second, Developmental Pathways is not in the commercial support industry because it does not "provid[e] services to other commercial firms through the use of service employees." 7 CCR 1103-1:2(B); *see* SOF ¶ 37. Developmental Pathways provides specialized services to individuals with developmental disabilities, not other commercial firms. *See id.* In a recent case, this Court determined that a business that was contracted to perform specialized tasks "unlike the routine tasks the regulation lists as examples of those provided in the regulatory definition," was not in the commercial support services industry. *See Blanco v. Xtreme Drilling & Coil Servs.*, 2018 WL 1138293 (D. Colo. Mar. 2, 2018). Likewise, Developmental Pathways does not provide the

---

[8] A true and accurate copy of the *Smith v. Mountain Valley Developmental Services, Inc.* decision is annexed hereto as Exhibit "H", as it is an unpublished opinion.

services listed in the Wage Order, such as "clerical, keypunching, janitorial, laundry or dry cleaning, security, building or plant maintenance, parking attendants, equipment operations, landscaping and grounds maintenance." 7 CCR 1103-1:2(B).  Therefore, Developmental Pathways is not in the commercial support industry.

Third, Developmental Pathways is not in the food and beverage industry because its business is not "prepar[ing] and offer[ing] for sale, food or beverages for consumption." 7 CCR 1103-1:2(C); *see* SOF ¶ 38.  The Tenth Circuit has held that the food and beverage industry is limited to those that sell food to the general public: "Reading the food and beverage industry definition as a whole, it is plain that food and beverage employers are those that sell food directly to the consuming public, rather than for resale." *Salazar v. Butterball, LLC*, 644 F.3d 1130, 1144 (10th Cir. 2011).  In *Salazar*, the Tenth Circuit affirmed this Court's decision that the defendant, a turkey processing plant, was not in the food and beverage industry because "Butterball's food products are prepared for eventual consumption (after all, they are food), but they are not *sold* for consumption." *Id.*  Similarly, Developmental Pathways may prepare and provide food to its clients as part of the services it provides, but Developmental Pathways does not prepare and offer for sale food or beverages for consumption. *See* SOF at ¶ 39.

Finally, Developmental Pathways is not part of the health and medical industry because it does not provide health services to its clients. 7 CCR 1103-1:2(D); *see* SOF ¶ 40. Developmental Pathways instead provides case management, early intervention services, and community outreach. *See* SOF at ¶ 41.  As the court in *Smith* noted regarding another Community-Centered Board, Developmental Pathways "is not a hospital, home health care provider, a hospice center, a nursing home or a mental health center" nor does Developmental Pathways provide "medical, surgical or any other health services." *Smith*, at *5.

As set forth above, Developmental Pathways is not in one of the four industries in which the Wage Order applies, and therefore, Developmental Pathways is not covered thereunder.

### ii. *Continuum is not within the four industries covered by the Wage Order.*

Continuum is not subject to the Wage Order because, like Developmental Pathways, it is not an employer within any of the four industries covered by the Wage Order. Additionally, as set forth in Section C., *infra*, Continuum is not subject to the Wage Order because the Colorado Dep't of L&E has clarified that service agencies are not covered by the Wage Order, and Continuum is a service agency.

Continuum does not meet any covered-industry definition in the Wage Order. Initially, Continuum is not in the retail and service industry because it does not "generate 50% or more of its annual dollar volume of business" from the sale of "any service, commodity, article, good, real estate, wares, or merchandise to the consuming public." 7 CCR 1103-1:2(A); *see* SOF ¶ 42. Rather, Continuum generates its income from donations and public money, which it then uses to provide services to individuals with developmental disabilities. *See* SOF at ¶ 43. As in *Smith*, Continuum does not advertise its services to the general public. *See Smith,* at *5. Therefore, Continuum is not in the retail and service industry.

Second, Continuum is not in the commercial support industry because it does not "provid[e] services to other commercial firms through the use of service employees." 7 CCR 1103-1:2(B); *see* SOF ¶ 45. Like Developmental Pathways, Continuum provides services to individuals with developmental disabilities, not to other commercial firms, and Continuum does not provide any of the routine services listed in the Colorado Minimum Wage Order's definition of commercial support services. *See* SOF at ¶ 45; *Blanco v. Xtreme Drilling & Coil Servs.*, 2018 WL 1138293 (D. Colo. Mar. 2, 2018) (determining that a business was not in commercial support services

because it performed specialized, rather than the routine services, as stated in the Wage Order).

Third, Continuum is not in the food and beverage industry because its business is not "prepar[ing] and offer[ing] for sale, food or beverages for consumption." 7 CCR 1103-1:2(C); *see* SOF ¶ 38.  As explained above, the food and beverage industry is limited to businesses that "sell food directly to the consuming public." *Salazar v. Butterball, LLC*, 644 F.3d 1130, 1144 (10th Cir. 2011). Here, although LSS may prepare and provide food to residents as part of the services they provide, Continuum does not prepare and offer food or beverages for sale to the consuming public. *See* SOF at ¶ 39.

Finally, Continuum is not part of the health and medical industry because it does not provide health services to its clients. 7 CCR 1103-1:2(D); *see* SOF ¶ 46. Continuum instead provides residential services, transportation, day programs, and employment services. *See* SOF ¶ 47.  As in *Smith* and like Developmental Pathways, Continuum "is not a hospital, home health care provider, a hospice center, a nursing home or a mental health center," nor does Continuum provide "medical, surgical or any other health services." *Smith*, at *5.  Therefore, because Continuum is not part of one of the four industries listed in the Wage Order, the Wage Order does not apply to it, and Plaintiff's claims thereunder should be dismissed.

**C.**     **The Colorado Department of Labor and Employment has confirmed that the Wage Order does not apply to Defendants.**

      **i.**     ***The Colorado Dep't of L&E's 2012 Advisory Bulletin***

On March 31, 2012, the Colorado Dep't of L&E issued its 2012 Advisory Bulletin and Resource Guide (the "2012 Advisory Bulletin) to clarify that the Wage Order does not apply to Community Centered Boards or service agencies such as Developmental Pathways and Continuum, respectively.  The 2012 Advisory Bulletin states in relevant part:

> Community Centered Boards and service agencies that are planned, designed, organized, operated, and maintained to provide services to and for individuals with developmental disabilities as defined in C.R.S. 27-10.5-202 *are exempt from all provisions of the Wage Order*.

*See* Exhibit "I"[9] (emphasis added).

There is no dispute that Developmental Pathways is a Community Centered Board, as it is a not-for-profit corporation designated pursuant to C.R.S. § 25.5-10-209 to provide case management services to persons with intellectual and developmental disabilities. *See* SOF at ¶ 1; *see also* C.R.S. § 25.5-10-202(4).  Indeed, the Colorado Department of Health Care website lists Developmental Pathways as a Community Centered Board. *See* Colorado Department of Health Care, Community Centered Boards, available at *https://www.colorado.gov/pacific/hcpf/community-centered-boards* (last visited Nov. 19, 2018).

Likewise, it is undisputed that Continuum is a service agency because it is a business providing services or supports for persons with intellectual and developmental disabilities. *See* SOF ¶ 5.  Specifically, Continuum is a "Program Approved Service Agency," because it has been so designated by the Colorado Department of Health Care Policy and Financing pursuant to that department's authority to govern services and supports for individuals with developmental disabilities authorized and funded in whole or in part through the department. *See* SOF ¶ 4; *see also* C.R.S. § 25.5-10-202(34); 10 CCR 2505-10:8.600, *et seq*; *J.C. v. Dungarvin Colorado, LLC*, 252 P.3d 41, 44 (Colo. App. 2010).  For example, Continuum provides a number of services to people with developmental disabilities, which include residential services, transportation, day programs, employment, and other services that are needed by that population. *See* SOF at ¶ 47. Therefore, Continuum is not covered by the Wage Order.

---

[9] A true and accurate copy of the Colorado Dep't of L&E's 2012 Advisory Bulletin is annexed hereto as Exhibit "I".

### a.   *Smith v. Mountain Valley Developmental Services, Inc.*

A recent decision issued by the Garfield County District Court on April 12, 2018 is in line with the case at bar.  In *Smith*, the Court dismissed a putative wage and hour class action because the Wage Order was not applicable to the defendant employer, a Community Centered Board like Developmental Pathways. *See generally, Smith v. Mountain Valley Developmental Services, Inc.*, Case No.: 2018-cv-30026. (Colo. Dist. Ct. Apr. 12, 2018).  Just as plaintiff here, in *Smith*, the plaintiff sought overtime compensation for hours worked in excess of 12 hours in a day pursuant to the corresponding provision of the Wage Order. *Id.*

Initially, the *Smith* court confirmed that the Wage Order only applies to the four industries discussed above and confirmed that the defendant, Mountain Valley Developmental Services, Inc. ("Mountain Valley"), a Community Centered Board, was not covered under the Wage Order because, just as Defendants here, it is not a hospital, home health care provider, hospice center, nursing home, or mental health facility and because it does not provide medical, surgical or, other health services. *Id.*  As part of its analysis, the *Smith* court determined that Mountain Valley, as a Community Centered Board, provided "training services for mentally retarded and for seriously handicapped persons within the area to be served by the corporation." *Id.*  Here, Defendants' purpose is to provide normal living and social environments to adults with moderate developmental disabilities who function with some required supervision.  It is undisputed that Developmental Pathways is a Community Centered Board and Continuum is a Program Approved Service Agency, which removes them from the scope of the Wage Order because they are not within any of the four covered industries.

The *Smith* court assessed the Colorado Dep't of L&E's 2012 Advisory Bulletin, and explained its significance: clarification that Community Centered Boards and service agencies are not subject to any provisions of the Wage Order. *Id.*  The court rejected the plaintiff's argument

that the 2012 Advisory Bulletin is contrary to the law and should be disregarded; finding, rather, the 2012 Advisory Bulletin did not create a new exemption, but rather, simply clarified that Community Centered Boards are not covered by the Wage Order. *Id*.  The court also rejected the plaintiff's position that the 2012 Advisory Bulletin violates Colorado's Administrative Procedures Act. *Id*.

The *Smith* court explained that because the 2012 Advisory Bulletin did not create a new exemption, the Colorado Dep't of L&E's actions were not subject to the Colorado Administrative Procedures Act. *Id*.  Finally, the court rejected the plaintiff's due process argument finding that the Colorado Dep't of L&E has express regulatory authority to interpret the Wage Order. *Id*.  The *Smith* decision and underlying analyses are directly on point with the law in this case, and as such, the same result should be reached.

### ii.    *The Colorado Dep't of L&E's Written Orders*

The inapplicability of the Wage Order to Defendants is further demonstrated by the Special Exemption Orders issued by the Colorado Dep't of L&E, Director of the Division of Labor Standards and Statistics, which orders predate the 2012 Advisory Bulletin. *See* Exhibits "J" and "K".[10]  These orders demonstrate Defendants' desire to ensure that their own legal interpretation was consistent with the law.  Notably, these exemption orders expressly exempt from the Wage Order group homes, such as those operated by Continuum. *See id*.  As such, Plaintiff's state law claims under the Wage Order fail as a matter of law and must be dismissed.

## II.    PLAINTIFF WAS PROPERLY PAID FOR ALL COMPENSABLE WORK PERFORMED DURING HER SHIFTS

In Count Two of her Amended Complaint, Plaintiff alleges compensation claims under the

---

[10] True and accurate copies of the Colorado Department of Labor & Employment Exemption Letters, dated March 6, 1998 and November 17, 2003 are annexed hereto as Exhibits "J" and "K".

FLSA.[11] Specifically, Plaintiff seeks compensation for: (1) work performed before the beginning and after the end of her shifts ("pre- and post-liminary time"); (2) her sleep-time; and (3) work performed on the nights of daylight savings time.

Plaintiff was paid for all compensable work performed during her shifts as required by the FLSA. Specifically: (i) Plaintiff was compensated for all pre- and post-liminary time as required by the FLSA; (ii) Plaintiff was compensated for all reported calls to duty during her sleep-time, and was not entitled to pay during her sleep-time because Continuum was entitled to take the "sleep-time credit"; and (iii) the FLSA does not require compensation for daylight savings time related time shifts occurring during sleep-time. *See infra*, Section II.B. Because there is no dispute of material facts, this Court should grant summary judgment in favor of Defendants as to Count Two of the Amended Complaint.

## A.     **Plaintiff is not entitled to compensation for any pre- or post-liminary time.**

Plaintiff alleges that the brief time spent speaking with the outgoing LSS upon her arrival at the Nevada House, or with the incoming LSS at the end of her shift, is compensable. Plaintiff testified that she sometimes stayed after her shift to talk to the incoming LSS working the next shift. *See* Exhibit "E" at 136:5-21. Notably, Plaintiff stated that she sometimes had to stay five minutes past her shift to share information with the incoming LSS. *See id.* at 136:12-15. However, these few minutes that Plaintiff may have spent talking to another employee without compensation is non-compensable, *de minimis* time. *See* 29 C.F.R. § 785.47.

Initially, because Plaintiff was not responsible for the supervision of the Nevada House residents until the start of her 2.5 Day Shift and because such responsibilities ceased at the end of

---

[11] Because, as explained above, Plaintiff's claims under Colorado state law fail, all remaining claims are addressed under federal law.

her shift, any actions Plaintiff claims to have taken before or after her shift were not integral or indispensable to the principal activities of her job. *See* SOF ¶ 48;29 C.F.R. § 785.47; *cf. Steiner v. Mitchell*, 350 U.S. 247 (1956). The fact that such conversations were not integral or indispensable is further confirmed by the fact that Plaintiff could not remember how frequently she may have stayed after her shift to speak with an incoming LSS. *See* Exhibit "E" at 136:24-25. Critically, Plaintiff's time records confirm that she was in fact compensated for any of these conversations that took more than just a few minutes, as Plaintiff's compensated hours extended at least 15 minutes past the scheduled end of her shift on twelve (12) occasions. *See* Exhibit "G" (2014: May 2, June 6, July 4, July 10; 2015: February 13, May 29, July 3, August 26, September 4, September 6, September 18, and October 30).

It may have benefitted Plaintiff to speak with the outgoing LSS prior to her 2.5 Day Shift; however, all necessary information was available for Plaintiff in the Nevada House residents' daily logs prepared each day by the LSS on duty. Indeed, these client logs show that there were typically no significant events, underscoring how quickly the verbal communication of significant events could occur. *See* SOF at ¶ 51. When Plaintiff arrived early, this pre-shift time was hers to engage in personal activities with no principal work activity being performed. *See id.*, at ¶ 49. These circumstances are similar to those found as not integral and indispensable by the Tenth Circuit in *Smith v. Aztec Well Serv. Co.*, 462 F.3d 1274, 1289 (10th Circ. 2006). Accordingly, Plaintiff is not entitled to compensation for this time, as it not integral or indispensable to the principal activities of the job.

Assuming, *arguendo*, that the limited briefing time which Plaintiff bases her claim upon involved a principal activity of work, it nonetheless remains not compensable time. The pre- and post-shift time spent by LSS employees speaking to the outgoing and incoming LSS employee is

clearly *de minimis* time and not compensable, as Plaintiff confirmed that these conversations typically took less than 5 minutes. *See* Exhibit "E" at 136:12-15.   A 2.5 Day Shift is comprised of 3,360 minutes of which 2,400 minutes were work time and an additional 960 minutes were sleep time.   Even taking Plaintiff's testimony at face value, such pre- and post-liminary briefing time when combined still constituted less than 0.3% of her 2.5 Day Shift and is thus not compensable. *See Reich v. Monfort, Inc.,* 144 F.3d 1329, 1333 (10th Cir. 1998) (quoting *Anderson v. Mount Clemens Pottery Co.,* 328 U.S. 680, 693 (1946) (holding that time may be excluded if it "is so insubstantial and insignificant that it ought not to be included in the work week") (quotations omitted); *see also* 29 C.F.R. § 785.47.

For example, in *Lyons v. Conagra Foods Packaged Foods LLC*, 899 F.3d 567, 584 (8th Cir. 2018), the court determined that the time employees spent checking-in and checking-out tools was *de minimis*, and thus not required to be paid, because this process took "two to five minutes" and would have been an "administrative burden" to track. *Id*. The United States Supreme Court has also stated that employers are not liable for *de minimis* amounts of time:

> When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a *substantial measure* of his time and effort that compensable working time is involved.

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946), *superseded by statute on other grounds* as recognized in *Integrity Staffing Sols., Inc. v. Busk*, 135 S. Ct. 513 (2014).   In *Anderson*, a group of employees asserted FLSA claims against their employer, alleging, *inter alia*, that they were not properly compensated for the time they spent walking from the location of the time clock to their work stations.   The Supreme Court noted that "[t]he de minimis rule can doubtless be applied to much of the walking time involved in this case." *Id*.

Moreover, this *de minimis* time is also properly excluded as part of rounding permissible under 29 C.F.R. § 785.48(b). Thus, when using a quarter hour rounding procedure, time less than 7 minutes can be rounded to zero and time in excess of 7 minutes is rounded to 15 minutes and then compensated. Plaintiff's time records are consistent with this practice. Plaintiff's hours were extended by at least 15 minutes on 12 separate occasions when the pre- or post-shift briefings lasted more than a few of minutes. *See* Exhibit "G". Thus, pursuant to 29 C.F.R. § 785.48(b) the time sought by Plaintiff related to the pre- and post-shift briefings is not compensable. It was typically very short and on the rare instance it exceeded 7 minutes, it was paid by Continuum.

**B.** **Plaintiff is not entitled to compensation for sleep time during the 2.5-Day Shift.**

Plaintiff claims she is owed compensation for her sleep-time.[12] Federal regulations permit deductions of up to eight (8) hours of sleep time under the circumstances present here. 29 CFR § 785.22 has five components: (i) no deduction of greater than 8 hours per day; (ii) a minimum of 5 hours of sleep time is usually enjoyed by the employee during that 8-hour period; (iii) payment for work activities that are an interruption during the sleep time (call to duty); (iv) adequate sleep facilities; and (v) the shift arrangement is expressly or impliedly agreed to. All of the above conditions are satisfied here, and consequently, Plaintiff is not entitled to any wages for sleep periods during the 2.5 Day Shift.

**i.** *Defendants did not deduct more than 8 hours per day for sleep time.*

Employers may not deduct more than 8 hours of sleep time when an employee works for at least twenty-four hours. *See* 29 C.F.R. § 785.22(a). Here, it is undisputed that no more than 8 hours per day were ever deducted from Plaintiff's wages pursuant to the 2.5 Day Shift.

---

[12] Plaintiff also brings this claim under Colorado state law. However, because sleep time requirements are set forth under the Wage Order, and the Wage Order does not apply to Defendants as set forth above, Defendants are entitled to judgment as a matter of law on Plaintiff's sleep time allegations brought pursuant to state law.

ii.     *Plaintiff was provided with adequate sleeping facilities.*

The second prerequisite requires that the employer provide the employee adequate sleeping facilities. *See* 29 C.F.R. § 785.22(a).  Courts have found that a sleeping facility is adequate "if it provides a favorable environment that would enable sleep to occur and provide[s] reasonable assurance that [the employee] will be rested and alert when [the] duty time begins." *Trocheck v. Pellin Emergency Med. Serv., Inc.*, 61 F. Supp. 2d 685, 694-95 (N.D. Ohio 1999).  In order for a "favorable environment" to exist, the sleeping facilities must create a "home-like environment" with "more than a couch or hideaway bed in a common area." *Hill v. Family Tyes Inc.*, 2015 WL 2236158, at *9 (E.D. Mich. May 12, 2015).  Further, it is worth noting that the regulation "is clearly *not* designed to ensure employees are well-rested—five hours of sleep, even if consecutive, does not usually leave a person fully refreshed." *Trocheck*, 61 F. Supp. 2d at 695.

Here, Plaintiff was at all times provided with adequate sleeping facilities. That is, Plaintiff had a private room with a bed that she did not have to share while she was sleeping, as well as a private bathroom. *See* Exhibit "L"[13].  In fact, Plaintiff acknowledged that she slept in a bedroom that had a private bathroom adjacent to it, which also had a computer in it. *See* Exhibit "E" at 128:9-11; 129:19-20.  Plaintiff also acknowledged that she was provided with pillows and sheets, although she ultimately chose to bring her own. *See id.* at 129:5-12.  Plaintiff also had a kitchen available to her and, although she chose to bring her own food, Plaintiff had the option of eating whatever food was available to the residents at no cost to her. *See id.* at 130:17-131:1. These facilities clearly fostered a "home-like environment" because Plaintiff had her own bed in a private bedroom with a private bathroom. *See Hill*, 2015 WL 2236158 at *9.

---

[13] True and accurate copies of photographs of Plaintiff's sleeping facilities at the Nevada House are annexed hereto as Exhibit "L".

Further, the fact that an employee's sleep may be "temporarily disturbed on occasion" does not indicate that the sleeping facilities were inadequate. *See Beaston v. Scotland Sch. for Veterans' Children*, 693 F. Supp. 234, 238 (M.D. Pa. 1988). For example, in *Beaston*, the plaintiffs, house parents at a school, alleged that they were not provided adequate sleeping facilities because they were "unable to obtain normal rest during the uncompensated periods of sleeping time" due to "noises from students, the hearing system, passing trains and security guards." *Id.*  The court determined that the sleeping facilities were adequate because "[t]he noises they complain of are not unlike those in many homes in many communities" and the employees made "few complaints about nighttime interruptions." *Id.* at 238-29.

The sleeping facilities provided to Plaintiff here are similar to those provided to the plaintiffs in *Beaston*.  In that case, the plaintiffs lived with students in cottages that had a private bedroom and bathroom for the employees to use, as well as a shared kitchen and dining area. *Id.* at 238.  The plaintiffs were also allowed to bring in articles of personal property and food. *Id.* Similarly, here, Plaintiff had her own private bedroom and bathroom; she had access to a shared kitchen area; and she was able to bring her own personal property and food.  Additionally, although Plaintiff claims that the sleeping facilities were inadequate because of distractions, such as a light on in the hallway, such distractions were "not unlike those in many homes in many communities" and thus do not render the sleeping facilities inadequate. *Id.*

Notably, courts throughout the country, as well as the United States Department of Labor, have acknowledged that adequate sleeping facilities were provided under conditions much less desirable than those present here. *See Bridgeman v. Ford, Bacon & Davis*, 161 F.2d 962, 963 (8th Cir. 1947) (sleep time requirements satisfied where the "dormitory" facilities were equipped with a kitchen, toilet, and shower, and the employees received beds, blankets, and bed linens); *Bowers*

*v. Remington Rand*, 159 F.2d 114, 115 (7th Cir. 1946) (sleep time properly deducted where employees' sleeping quarters "consisted of large rooms with wooden or iron beds and mattresses" as well as "cooking facilities and utensils, bathing and toilet facilities, bedding and laundry service"); *see also* US DOL Field Assistance Bulletin No. 2016-1, April 25, 2016 (adequate sleeping facilities are provided when the employee has access to "basic sleeping amenities, such as a bed and linens; reasonable standards of comfort; and basic bathroom and kitchen facilities (which may be shared)"); *Petrone v. Werner Enters., Inc.*, 2017 WL 510884, *7 (D. Neb. Feb. 2, 2017) (holding that the sleeping berth in a truck is an adequate sleep facility for the 24-hour shift sleep time analysis); *Eustice v. Fed. Elevator Co.*, 66 F. Supp. 55 (D. Minn. 1946) (dormitory style sleeping facilities with over a dozen other employees was adequate as a matter of law).

Additionally, sleeping facilities are adequate as a matter of law where the plaintiff does not complain about the sleeping facilities during employment. For example, in *Trocheck v. Pellin Emergency Medical Service, Inc.*, the employee alleged that the employer improperly deducted sleep time. 61 F. Supp. 2d 685 (N.D. Ohio 1999). The court in *Trocheck* granted summary judgment in favor of the employer, and when discussing the adequacy of sleeping facilities, the court noted that "the most telling indicator of whether the sleeping facilities were adequate is whether [the plaintiff] ever indicated in any way that they were not." *Id.* at 695. Because the plaintiff had not complained about the sleeping facilities during his employment, the court determined that the sleeping facilities were adequate. *Id.*

As in *Trocheck*, Plaintiff here never complained about the sleeping facilities prior to commencing her lawsuit, indicating that Plaintiff found the sleeping facilities adequate. *See, e.g.*, *Trocheck v. Pellin Emergency Med. Serv., Inc.*, 61 F. Supp. 2d 685, 695-96 (N.D. Ohio 1999) (determining that, because the plaintiff did not complain about the sleeping facilities, "a reasonable

finder of fact could only conclude that [the plaintiff] found the sleeping quarters provided to him by [the defendant] were 'adequate'").   Accordingly, there is no dispute of material fact over Plaintiff's sleeping facilities and these sleeping facilities were adequate.

>   **iii.**   ***Plaintiff usually enjoyed an uninterrupted night's sleep.***

Another requirement for employers to be able to deduct up to eight hours of sleep time is that the employees usually enjoyed an uninterrupted night's sleep. 29 C.F.R. § 785.22. The Regulations define "uninterrupted" as meaning that an employee be able to sleep at leave five hours during the sleep period. *Id.*   Additionally, the United States Department of Labor has explained that "usually enjoy" means at least 50% of the time. *See* US DOL's Field Operations Handbook, §31b12(c)(2) ("Interruptions to an employee's 5 consecutive hours of sleep that occur during half or more than half of an employees' shifts are too frequent to meet this requirement.").

Plaintiff was required to report all instances of work performed during every 2.5 Day Shift sleep period. *See* SOF ¶ 19. Notably, from 2014 through the end of her employment, there were only 17 instances (out of no less than 230 sleep periods) where Plaintiff reported interruptions during her regularly scheduled sleep period, *i.e.*, only approximately 7.4% of her sleep periods. *Id.* at ¶ 24; Exhibit "G".   This frequency of sleep interruptions falls significantly below the 50% threshold and therefore, Plaintiff usually enjoyed an uninterrupted night's sleep as required by 29 C.F.R. § 785.22(a); *see also Roy v. County of Lexington, South Carolina*, 141 F.3d 533, 546-47 (4th Cir. 1998) (employees "usually enjoyed an uninterrupted night's sleep" where 35% of sleep periods "were interrupted to such an extent that employees received less than five hours sleep").

>   **iv.**   ***Plaintiff agreed to the structure of the 2.5 Day Shift.***

In order to deduct sleep time, the employer and the employee must have an agreement, which may be express or implied. *See Braziel v. Tobosa Developmental Servs.*, 166 F.3d 1061,

1063 (10th Cir. 1999); *see also* 29 C.F.R. § 785.22.   Unhappiness about the agreement does not

negate its existence. *See id.* (analyzing whether the plaintiffs were entitled to pay during sleep time

and noting that "[a]lthough it is clear from the record and [plaintiffs'] pleadings that they became

unhappy with the policy sometime after beginning their employment with [defendant], it is equally

clear that [plaintiffs] understood and acquiesced to the policy when they were hired").

Plaintiff agreed to exclude sleep time from compensable work time as part of the 2.5 Day

Shift because she knew the terms of the agreement to exclude sleep-time from compensable time-

during the 2.5 Day Shift.   This is confirmed by Plaintiff's continued conduct, which demonstrates

acceptance of that agreement.

At her deposition, Plaintiff confirmed she knew that each 2.5 Day Shift consisted-of 56-

hours at the residence, and that she would be compensated for the 40-hours she was on duty. *See*

Exhibit "E" at 45:7-11.   Likewise, Plaintiff confirmed that she knew before she began her

employment that she would not be paid for sleep-time during the 2.5 Day Shift. *See id.*, at 42:22-

24; 44:11-18.   Plaintiff knew of the work schedule and compensation terms before she started her

employment, accepted those terms and began employment, and accepted paychecks where sleep-

time was not compensated.   This is sufficient to establish an agreement for purposes of the sleep

time deduction. *Ariens v. Olin Mathieson Chemical Corp.,* 382 F.2d 192 (6th Cir. 1967). Moreover,

Plaintiff expressed no objection and her continuous reporting to work constitutes acceptance and

agreement under these Regulations. *See General Electric Co. v. Porter*, 208 F.2d 805 (9th Cir.

1953); *see also Roy v. Cnty. of Lexington, S.C.*, 928 F. Supp. 1406 (D.S.C. 1996) *aff'd* 141 F.3d

533 (4th Cir. 1998) ("An implied agreement to deduct sleep time from an employee's

compensation clearly exists if the affected employee does not assert any verbal or written protest

to the application of the exemption within a reasonable period of time of (1) the adoption of the

policy or (2) the employee being hired under the policy.").  Accordingly, there is no material fact in dispute that Plaintiff agreed to deduct sleep-time from compensable-time.

        **v.**    ***Plaintiff was paid for calls to duty during her sleep-time.***

An employee who is required to work during their sleep-time must be compensated for the time spent performing that work. *See* 29 C.F.R. § 785.22(b).   Pursuant to Continuum policy and practice, Plaintiff was directed to record all work performed during her sleep-time on her time report, so that she could be compensated for that time. *See* SOF at ¶ 19-20.  This policy and practice, along with Plaintiff's understanding thereof, is confirmed by the fact that Plaintiff was compensated every time she reported working during her sleep-time, *i.e.*, 17 occasions from 2014 through the end of her employment. *See* Exhibit "G" (2014: February 28; May 9; June 6; June 20; October 10; 2015: January 9; January 23; February 20; February 27; March 6; June 21; June 19; October 16; and April 30, 2016).

Defendants' motion on this claim should be granted because there are no genuine issues of material fact regarding the above-factors, Plaintiff is not entitled to compensation for her sleep-time during her 2.5 Day Shifts; and because Plaintiff was compensated for all time spent working during her sleep periods.

**C.**    <u>**Plaintiff was properly compensated for work on the nights of daylight savings time.**</u>

Finally, Plaintiff claims she is owed compensation for work performed on the night of daylight savings.[14]   It is undisputed that Plaintiff was not paid for sleep-time on the nights of daylight savings time. *See* Exhibit "E" at 140:2-5.  However, Plaintiff was not required to be paid for this time because the time changes occurred during her regularly scheduled sleep-time, which

---

[14] To the extent that Plaintiff attempts to bring this claim under Colorado law, her claim is barred because the Colorado Wage Order addresses sleep time, and, as explained above, the Wage Order does not cover Defendants. *See supra*, Section I.

was not compensable under federal law. *See* C.F.R. § 785.22(a). Nothing in the sleep time regulations make this time compensable.

Thus, the FLSA does not require compensation for one hour due to the time change at either seasonal time as it occurs during sleep periods and is not a call to duty.  Any payment for this time is at the discretion of the employer because it is not a situation where Plaintiff was engaged to wait. *See Skidmore* v. *Swift,* 323 U.S. 134 (1944).   Indeed, Plaintiff did not perform work during her sleep-time because of time changes resulting from daylight savings time.

**D.**      **Plaintiff was paid for all hours recorded on her time card.**

The FLSA requires that employers pay employees for all hours worked. *See* 29 U.S.C. § 206.   Likewise, the Colorado Wage Act requires employers to pay employees all wages or compensation. *See* § 8-4-103, C.R.S.  Plaintiff was at all times paid for all hours she worked.  For example, although Plaintiff claims that she was not paid for work performed before and after her shift, the documentary evidence confirms that when Plaintiff occasionally clocked in before her scheduled shift started and after her shift ended, she received compensation for all such time. *See* Exhibit "G" (demonstrating that Plaintiff was compensated when her pre- and post-liminary time was more than *de minimis* on a dozen occasions).  By her own account, Plaintiff sometimes clocked in before her scheduled shift began to count the residents' medication and to get ready for her shift. *See* Exhibit "E" at 74:5-9.  However, as demonstrated above, Plaintiff was always compensated for all time reflected on her timecards.  Moreover, at no time were any of Plaintiff's timecards manually altered to delete time that Plaintiff worked. *See* Exhibit "B" at ¶ 21; Exhibit "C" at ¶ 27.

**i.**      ***Any unpaid time was the result of Plaintiff's failure to comply with policy.***

Continuum maintained a policy requiring employees to record all time worked, including any calls to duty during an employee's sleep period. *See* SOF at ¶ 19-20.  Continuum could not

know about any calls to duty unless Plaintiff reported such calls to duty in her time entries – something Plaintiff did on 17 occasions from 2014 through the end of her employment. *See* SOF ¶ 25; Exhibit "G".   Therefore, any unpaid time was the direct consequence of Plaintiff failing to comply with these established policies and not reporting time-worked.

The law is clear: where an employee "fails to notify the employer through the established overtime record-keeping system, the failure to pay overtime is not a FLSA violation." *Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1230-31 (10th Cir. 2012).[15]   In *Brown*, the plaintiff claimed that his employer had not properly compensated him for his overtime work.   The trial court granted summary judgment in favor of the defendant-employer on all of the plaintiff's FLSA claims, which was affirmed by the Tenth Circuit. *Id.* at 1224.   The Tenth Circuit explained that the plaintiff "chose not to enter any of the hours he allegedly worked from home in [his employer's] timekeeping system.   He did not keep any other record of any sort to document the hours worked." *Id.* at 1230.   The plaintiff claimed that it was his employer's burden to keep accurate records, but the Tenth Circuit stated that the employer did keep accurate records, and the plaintiff "easily could have entered his hours; in fact, he was required to do so." *Id.*   Therefore, he was not entitled to relief under the FLSA because he violated company policy by failing to accurately record his time.

Because Plaintiff was required to record all time she worked during her 2.5 Day Shift, she cannot now claim that Defendants violated the FLSA because she failed to report time to her employer. *See, e.g.*, *id.* (affirming summary judgment in favor of the employer in an FLSA suit because the employee did not follow company policy to report allegedly unpaid work time).

As set forth in Section II, *supra*, there are no genuine disputes of material fact that Plaintiff was compensated for all time worked during her shifts as required by the FLSA.   Specifically: (i)

---

[15] As explained above, any claims under Colorado state law are subject to the same analysis.

Plaintiff was compensated for all pre- and post-liminary time as required by the FLSA; (ii) Plaintiff was not entitled to pay during her sleep-time because Continuum was entitled to take the "sleep-time credit" and compensated Plaintiff for all reported interruptions during that sleep-time; and (iii) the FLSA does not require compensation for daylight savings time occurring during sleep-time. Because there is no dispute of material facts, this Court should grant Defendants' motion for summary judgment on the claims under Count Two.

### III.  PLAINTIFF'S CLAIM FOR EQUITABLE RELIEF SOUNDING IN QUASI CONTRACT FAILS AS A MATTER OF LAW

#### A.  Plaintiff's third cause of action seeking equitable relief is preempted by the FLSA.

Plaintiff's third cause of action asserts an equity-based claim based upon the contention that Defendants are liable to Plaintiff "in quasi-contract, including unjust enrichment under Colorado law." *See* Exhibit "M"[16] at ¶ 134.  However, Plaintiff's quasi-contract claim fails as a matter of law because such contract claims are preempted by the FLSA.  For example, in *Valverde v. Xclusive Staffing, Inc.*, this Court determined that the plaintiffs' equitable claims in a wage dispute were "preempted to the extent that they are for unpaid overtime wages or are simply a restatement of their FLSA claim." 2017 WL 3866769, at *9 (D. Colo. Sep. 5, 2017).  Even more recently, this Court again determined that the FLSA preempts state law claims where the plaintiff "alleges essentially identical facts in support of [the] state law and FLSA claims." *See Gomez v. Children's Hosp. Colo.*, 2018 WL 3303306, at *3 (D. Colo. July 8, 2018).

Here, Plaintiff's quasi-contract claim is "simply a restatement" of her FLSA claims because she merely alleges that she was not properly compensated.  Although Plaintiff does not incorporate any facts into her cause of action for equitable relief, the facts that would nonetheless support her such a claim are exactly those that would support her FLSA claim.  Therefore, because the FLSA

---

[16] A true and accurate copy of the Amended Complaint is annexed hereto as Exhibit "M".

preempts Plaintiff's claim for equitable relief under a quasi-contract theory, Defendants are entitled to judgment of a matter of law and Plaintiff's claim should be dismissed at this juncture.

## IV.   THE TWO-YEAR STATUTE OF LIMITATIONS SHOULD BE APPLIED

Defendants respectfully submit that any claim which accrued prior to July 14, 2014, *i.e.*, two years prior to the filing date of this action, is time barred per the two-year statute of limitations applicable to both FLSA and Colorado wage claims because Defendants at all times complied in good faith with all requirements relating to payment of Plaintiff's wages. *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) (FLSA claims ordinarily subject to two-year limitations period); C.R.S. § 8-4-122 (Colorado claims subject to same limitations period and willful conduct exception). The three-year period is an <u>exception</u>, and a party claiming it carries the burden to show the violation was willful. 29 U.S.C. § 255(a). Defendants respectfully submit that Plaintiff cannot meet her burden by the undisputed evidentiary records as noted above.

"To fall under the three-year limitation, the plaintiff must show that the employer knew or showed reckless disregard for the matter of whether its conduct violated the statute." *Mumby v. Pure Energy Serv., Inc.*, 636 F.3d 1266, 1270 (10th Cir. 2011). "Reckless disregard can be shown through action entailing an unjustifiably high risk of ham that is either known or so obvious that it should be known." *Id*. Indeed, a finding of willfulness requires greater culpability than mere negligence. *McLaughlin*, 486 U.S. at 133.

Willful violations have been found where evidence prove "(1) admissions that an employer knew its method of payment violations the FLSA prior to the accrual of the action; (2) continuation of a pay practice without further investigation after being put on notice that the practice violated the FLSA; (3) earlier violations of the FLSA that would put the employer on notice of the Requirements of the FLSA; (4) failure to keep accurate or complete records of employment; and

(5) prior internal investigations which revealed similar violations." *Smith v. Keypoint Gov't Solutions, Inc.*, 2016 WL 7324606, at *2 (D. Colo. Dec. 16, 2016) (collecting cases).

Here, Plaintiff is not entitled to the three-year exception because she is wholly unable to carry her burden of establishing that Defendants willfully violated the FLSA.  Indeed, stakeholders and agencies across Colorado have implemented the 2.5 Day Shift to foster a home-like environment in the same manner as Defendants as recognized by the Colorado Dep't of L&E. *See* Exhibits "J" & "K".  Moreover, Continuum required that its employees record all work performed and expressly prohibited employees from performing work off the clock in order to ensure accurate and prompt payment of wages.  Because Plaintiff is unable to present any evidence that Defendants ever willfully violated the FLSA, her claims, to the extent they survive summary judgment, are governed by the two-year limitations period as a matter of law. *See Bracmontes v. Bimbo Bakeries U.S.A. Inc.*, 2017 WL 3190740, at *6-*7 (D. Colo. July 14, 2017); *Smith*, 2016 WL 7324606, *2.

## CONCLUSION

Defendants are entitled to summary judgment dismissing all of Plaintiff's claims in the Amended Complaint, as there are no genuine issues of material fact requiring a trial.  Initially, Defendants are not covered by the Wage Order because they do not work in one of the four covered industries. Moreover, the Colorado Dep't of L&E has clarified that Community Centered Boards and Service Agencies are exempt from all provisions of the Wage Order.  There is no dispute that Developmental Pathways is a Community Centered Board nor is there a dispute that Continuum is a service agency providing services to individuals with developmental disabilities.

Second, Defendants are entitled to summary judgment as to Count Two of Plaintiff's Amended Complaint because Plaintiff was properly paid for all compensable work performed during her shifts.  Indeed, Plaintiff was always paid for all work time she reported.  To the extent that Plaintiff did not record any time worked, any such time was *de minimis*, and Plaintiff is not

eligible for relief because she willfully chose to violate company policy by failing to report her time.  Therefore, Defendants are entitled to judgment as a matter of law.

Further, Plaintiff is not entitled to compensation for sleep-time during the 2.5 Day Shift. Federal regulations are clear that employees do not have to paid for sleeping periods when certain conditions are met, such as adequate sleeping facilities and at least five consecutive hours of sleep. Because these conditions are all met here, there is no dispute of material fact, and Defendants are entitled to judgment as a matter of law.  Finally, Defendants are entitled to summary judgment on Count Three because Plaintiff's state law quasi-contract claim is preempted by the FLSA. For the reasons set forth above, Defendants Motion for Summary Judgment should be granted and Plaintiff's claims dismissed in their entirety.

Dated: November 19, 2018
      Denver, Colorado

Respectfully submitted,

**WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP**

By:    / s /    *Scott D. Sweeney*
        Scott D. Sweeney
        Celena R. Mayo
        Justin A. Guilfoyle
        1225 17th Street, Suite 2750
        Denver, Colorado 80202
        Ph: (303) 572-5300
        Fax: (303) 572-5301
        Scott.Sweeney@wilsonelser.com
        Celena.Mayo@wilsonelser.com
        *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of November, 2018, a true and correct copy of the foregoing was filed with the Clerk of the United States District Court using the CM/ECF system, and served to the following:


Alexander Hood
Attorney and Director of Litigation
Towards Justice
1535 High Street, Suite 300
Denver, CO 80218

Brian D. Gonzales
The Law Offices of Brian D. Gonzales
242 Linden Street
Fort Collins, CO 80524
*Attorneys for Plaintiffs*


By:    /s/ Scott D. Sweeney
       Scott D. Sweeney